UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID ERWIN                                          CIVIL ACTION

VERSUS                                               NO. 23-1005

DON MURRAY, ET AL.                          SECTION "R" (5)


## ORDER AND REASONS


Before the Court is defendants' motion for summary judgment.[1] Plaintiff opposes the motion.[2]  For the following reasons, the Court grants the motion.


## I.     BACKGROUND

This matter arises out of an incident when defendant Deputy Don Murray of the St. Charles Parish Sheriff's Office and other emergency personnel responded to a report that plaintiff, David Erwin, a sixty-five-year-old male, was experiencing a medical emergency.[3]  What ensued was a chaotic episode that ultimately resulted in Deputy Murray tasing plaintiff

---

[1]     R. Doc. 22.
[2]     R. Doc. 26.
[3]     R. Doc. 3.

twice before plaintiff was taken on a gurney to the hospital for treatment.[4] Plaintiff filed this action against Deputy Murray, in his individual capacity, and Gregory Champagne, in his official capacity as Sheriff of St. Charles Parish.[5] As to Deputy Murray, plaintiff alleges violations of his Fourth Amendment right to be free from unreasonable seizure as well as state law claims for false arrest, assault, battery, and negligence.[6] Plaintiff asserts only state law claims against Champagne for vicarious liability and negligence in hiring, training, disciplining, and failing to terminate Deputy Murray.[7]

### A.    Factual Background

The Court has reviewed the record on summary judgment, and the undisputed facts are as follows.

Plaintiff's wife, Darlene Erwin, called 911 at about 12:14 a.m. on April 13, 2022, to report that plaintiff was unresponsive and experiencing a medical emergency.[8] First responders, including Deputy Murray, arrived at plaintiff's home shortly thereafter.[9] Plaintiff's wife met Deputy Murray at

---

[4]    *Id.*
[5]    *Id.*
[6]    *Id.*
[7]    *Id.*
[8]    R. Doc. 26-4 at 3; R. Doc. 22-3 ¶ 4; R. Doc. 22-5 ¶¶ 1-3.
[9]    R. Doc. 22-5 ¶ 2.

the front door of their home, and informed him that she was concerned plaintiff was having a heart attack, and that he had a history of heart problems.[10]  Deputy Murray and the other first responders entered plaintiff's bedroom, at which time emergency medical technicians ("EMTs") initiated treatment on plaintiff, who was unresponsive, loudly snoring, and lying in his bed.[11]

The EMTs initially administered Narcan to plaintiff, after which plaintiff became more alert but remained confused and disoriented.[12] Plaintiff was observed babbling and rolling around on his bed for several minutes before he was able to stand up.[13]  First responders, with the assistance of several of plaintiff's family members, attempted to place plaintiff on a gurney for transport to the emergency room, but were met with resistance by the incoherent and disoriented plaintiff.[14]  Plaintiff could be heard pleading, "just let me go," and he refused to lie down on the gurney despite multiple requests.[15]  At one point during the encounter, plaintiff

---

[10]    R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC2," at 0:00-1:00.

[11]    *Id.* at 3:18-6:37; R. Doc. 22-5 ¶ 3.

[12]    R. Doc. 22-5 ¶ 4; R. Doc. 3 ¶ 10.

[13]    R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 0:00-6:30.

[14]    *Id.* at 6:50-9:30.

[15]    *Id.* at 6:50-8:55.

stood up on the gurney,[16] causing his wife to express concern for his safety and the safety of others standing nearby.[17]  After plaintiff stepped down from the gurney, and as several men were lifting plaintiff onto the gurney, a female EMT attempted to inject plaintiff with Ketamine.[18]  In response, plaintiff reached behind his body and grabbed the syringe from the EMT's hand.[19]  About ten seconds later, plaintiff abruptly jumped off the gurney and ran through the house while loudly screaming before exiting out of the front door in his t-shirt and boxer underwear, all while still holding the syringe.[20]

Deputy Murray followed plaintiff outside into his front yard and repeatedly ordered plaintiff to "get on the ground."[21]  After plaintiff failed to comply, Deputy Murray shouted "Taser, Taser, Taser" before discharging his taser, shocking plaintiff for about five seconds.[22]  The first tasing occurred

---

[16] The object plaintiff stood on is not visible in the body camera footage, but plaintiff confirms in his memorandum that it was the gurney.  R. Doc. 26 at 9.

[17] R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 9:00-9:19.

[18] *Id.* at 9:25-9:40.

[19] *Id.*  Plaintiff does not dispute that the content of the syringe was Ketamine. *See* R. Docs. 26 & 26-1.

[20] R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 9:40-10:03; R. Doc. 1 ¶¶ 12-14; R. Doc. 22-5 ¶ 6; R. Doc. 26-8 ¶ 10.

[21] R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:03-10:11.

[22] *Id.* at 10:11-10:20.

about twenty-three seconds after plaintiff jumped off the gurney[23] and ten seconds after Deputy Murray first ordered plaintiff to get on the ground.[24] Moments before the first tasing, plaintiff can be seen briefly raising his left hand holding a small white object, which defendants attest and plaintiff concedes was the syringe.[25] Neither Deputy Murray nor the other deputies specifically ordered plaintiff to drop the syringe during the encounter.[26]

As a result of the first tasing, plaintiff's body became rigid, and he fell to the ground.[27] Deputy Murray immediately ordered two other officers standing nearby to turn plaintiff onto his stomach. As the officers approached plaintiff, plaintiff began moving around, bending his knees and reaching for the bottom of his shorts with his right hand.[28] Without warning, Deputy Murray then deployed his taser for a second time.[29] The second

---

[23]   *Id.* at 9:51-10:14.

[24]   *Id.* at 10:04-10:14.

[25]   *Id.* at 10:04-10:05. Plaintiff does not contest that he held the syringe before the first tasing, but he argues that he did not wield it in an aggressive or threatening manner. R. Doc. 26-1.

[26]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:03-10:11.

[27]   *Id.* at 10:14-10:16.

[28]   *Id.* at 10:16-10:21.

[29]   *Id.* at 10:21-10:26.

tasing occurred about three-and-a-half seconds after the first taser cycle ended.[30]

Following the second tasing, the assisting officers turned plaintiff onto his stomach and placed him in handcuffs before moving him onto the gurney for transport to the hospital for additional medical care.[31]  Although now restrained, plaintiff continued to resist the efforts of first responders, erratically moving as officers attempted to handcuff him and thrashing about on the gurney while yelling incoherently.[32]  The syringe was later recovered after the second tasing by one of the officers near where plaintiff had lain on the ground.[33]  At the hospital, plaintiff tested negative for alcohol and drugs, and it was documented by his treating physician that he had likely suffered a seizure with postictal psychosis.[34]  It was also noted that plaintiff suffered from a subdural hemorrhage, which the treating physician believed was caused when plaintiff fell after being tased.[35]

---

[30]    *Id.* at 10:14-10:21; *see also* R. Doc. 26-5 at 3 (Taser Report) (indicating that the first taser cycle ceased at 42:38.958, and the trigger was pulled for the second tasing at 42:42.557).

[31]    R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:27-11:50.

[32]    *Id.* at 10:30-17:10.

[33]    *Id.* at 12:35-13:03.

[34]    R. Doc. 26-9.

[35]    *Id.*

## B.    Procedural Background

Plaintiff brought this action under 42 U.S.C. § 1983.  In his complaint, plaintiff alleges that the first tasing constituted an illegal seizure and excessive force in violation of the Fourth Amendment, and false arrest and assault and battery under state law.[36]   According to plaintiff, Deputy Murray's first tasing was unreasonable given his knowledge of plaintiff's mental state and the absence of an immediate threat.[37]   Plaintiff further asserts that the second tasing was excessive force in violation of the Fourth Amendment, and assault and battery under state law.[38]  Defendants filed an answer on May 20, 2023, in which they raised the defense of qualified immunity as to Deputy Murray.[39]

Defendants moved the Court to order plaintiff to submit a reply to Deputy Murray's assertion of a qualified immunity defense under Federal Rule of Civil Procedure 7(a).[40]   On August 7, 2023, the Court denied the motion, finding plaintiff's complaint sufficiently detailed to allow the Court to rule on any subsequent dispositive motion on qualified immunity.[41]   On

---

[36]    *Id.* ¶ 27.

[37]    *Id.* ¶ 22.

[38]    *Id.* ¶ 28.

[39]    R. Doc. 6.

[40]    R. Doc. 8.

[41]    R. Doc. 14.

October 27, 2023, the Court stayed all discovery in the matter pending resolution of the issue of qualified immunity.[42]

Defendants now move for summary judgment, seeking dismissal of plaintiff's § 1983 claim against Deputy Murray on the grounds that Deputy Murray is entitled to qualified immunity.[43] Defendants contend that Deputy Murray reasonably concluded that plaintiff was a danger to himself and to others based upon his objective non-compliance with the efforts of his family and EMS, aggressive mannerisms, and wielding of "a dangerous weapon," thereby justifying the use of the taser to place plaintiff in protective custody and transport him to a treatment facility.[44] In support of their motion, defendants submit footage of the incident recorded from Deputy Murray's body camera,[45] as well as a declaration from Deputy Murray[46] and an expert report prepared by Kerry Najolia, in which she opines that Deputy Murray's "decision to use non-deadly force (TASER) was justified, authorized and was consistent with policy, procedures, training, and police protocols."[47]

---

[42]   R. Doc. 21.

[43]   R. Doc. 22.

[44]   R. Doc. 22-1 at 22.

[45]   R. Doc. 27 (manual attachment).

[46]   R. Doc. 22-3.

[47]   R. Doc. 22-2 at 71.

In opposition, plaintiff contends that both the first and second tasing were unreasonable and excessive.[48]  As to the first tasing, plaintiff asserts that because he had committed no serious offense, was not attempting to flee or actively resisting law enforcement, and did not pose an immediate threat, a reasonable officer would have known that resorting to the use of the taser was clearly excessive and unreasonable.[49]  As to the second tasing, which occurred several seconds after the first tasing ended and while plaintiff was on the ground, plaintiff argues that it was an unreasonable use of overwhelming force given his lack of resistance or non-compliance.[50] Plaintiff attaches to his memorandum Deputy Murray's body camera footage,[51] an incident report filed with the St. Charles Parish Sheriff's Office,[52] taser records,[53] plaintiff's hospital records,[54] and declarations from plaintiff, his wife, and his son.[55]  Plaintiff also submits an expert report prepared by Ashley Heiberger, in which she opines that, under the totality of the circumstances, a reasonable officer would not have deployed a taser

---

[48]   R. Doc. 26.

[49]   *Id.* at 18-21.

[50]   *Id.* at 21-27.

[51]   R. Docs. 26-2 & 26-3 (manual attachment).

[52]   R. Doc. 26-4.

[53]   R. Doc. 26-5.

[54]   R. Doc. 26-9.

[55]   R. Docs. 26-6, 26-7, & 26-8.

against a non-criminal subject in an altered mental state who did not pose an imminent threat of harm to the officer or others.[56]

The Court considers the parties' arguments below.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a

---

[56]   R. Doc. 26-12.

motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)).  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

## III.  DISCUSSION

Plaintiff brings this action against Deputy Murray under § 1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, plaintiff must plead two allegations: (1) "that some person has deprived him of a federal right," and (2) "that the person who has deprived him of that right acted

under color of state or territorial law." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (internal quotation marks omitted)).

It is well established that qualified immunity shields public officials from suit and liability under § 1983, "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *accord Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022). This legal doctrine "attempts to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted)). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant

immunity only in rare circumstances." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)) (citing *Brady v. Fort Bend City*, 58 F.3d 173, 173 (5th Cir. 1995)).

The Court evaluates claims of qualified immunity at summary judgment using a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). The first prong "asks whether the facts, 'taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (cleaned up). The second prong of the analysis "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Officials operating under color of state law are thus entitled to summary judgment "if there is no violation, or if the conduct did not violate law clearly established at the time." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (citing *Tolan*, 572 U.S. at 655-56).

The plaintiff bears the burden of putting forth "summary judgment evidence" demonstrating why immunity is inapplicable. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (citation omitted); *see also Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) ("[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to

the plaintiff to show that the defense is not available." (citation omitted));
*Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992) ("The Fifth Circuit
does not require that an official demonstrate that he did not violate clearly
established federal rights; our precedent places that burden upon
plaintiffs.").  In other words, to rebut the immunity defense, a plaintiff must
show facts that make out a violation of a constitutional right and show that
the violated right was "clearly established" at the time of the alleged
violation.  *Joseph*, 981 F.3d at 329 & n.18 (citing *Pearson*, 555 U.S. at 232)
(distinguishing plaintiff's burden under Rules 12(b)(6) and (c) from the
burden of proof under Rules 50 and 56); *see also Crane*, 50 F.4th at 461
("When a defendant official moves for summary judgment on the basis of
qualified immunity, the burden then shifts to the plaintiff, who must rebut
the defense by establishing a genuine fact issue as to whether the official's
allegedly wrongful conduct violated clearly established law." (citation and
internal quotation marks omitted)).

    The Court must "adhere to the axiom that in ruling on a motion for
summary judgment, 'the evidence of the nonmovant is to be believed, and all
justifiable inferences are to be drawn in his favor.'"  *Tolan*, 572 U.S. at 651
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (cleaned
up).  In the qualified immunity context, "this usually means adopting . . . the

plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Joseph*, 981 F.3d at 325 ("In qualified immunity cases, which often involve competing versions of events, we take the plaintiff's version of the facts, unless that version is blatantly contradicted by the record, so that no reasonable jury could believe it." (citation and internal quotation marks omitted)). Additionally, when, as here, there is video evidence in the record, such evidence "can be dispositive on a motion for summary judgment," and the Court should rely on the clear video evidence when available. *Guerra v. Bellino*, 703 F. App'x 312, 316 (5th Cir. 2017) (citing *Scott*, 550 U.S. at 380-81); *see also Crane*, 50 F.4th at 461-62 (holding that district courts are "not bound to accept the nonmovant's version of the facts if it is contradicted by" unambiguously clear and irrefutable video evidence (citation omitted)); *Scott*, 550 U.S. at 378-380 (holding that when nonmovant's story is so "utterly discredited" by undisputedly accurate video evidence such that no reasonable factfinder could accept the nonmovant's version of events, the court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) ("[A] court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account.").

15

## A.    Constitutional Violation

The constitutional provision governing plaintiff's claims against Deputy Murray is the Fourth Amendment, which protects the right to be free from excessive force and unreasonable seizure.[57]  *See* U.S. Const. amend. IV (guaranteeing citizens the right "to be secure in their persons . . . against unreasonable . . . seizures," including protection against excessive force in the course of a seizure); *see also Tolan*, 572 U.S. at 656 ("When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989))).  "A violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph*, 981 F.3d at 332 (citing *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)); *see also Shepherd v. City of Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) ("To prevail on a Section 1983 excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." (citation and internal quotation marks omitted)).

---

[57]     R. Doc. 3 ¶ 42.

Whether the defendant's use of force was excessive or unreasonable is a "'necessarily fact-intensive' and case-specific inquiry," *Joseph*, 981 F.3d at 332 (quoting *Poole*, 691 F.3d at 628), that requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan*, 572 U.S. at 656 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted)); *accord Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021). This inquiry is an objective one, and requires the Court to consider the totality of the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see also id.* ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (citations omitted)); *Darden*, 880 F.3d at 728 ("In making this [excessive force] determination, a court should consider the totality of the circumstances."); *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016) ("A court must measure the force used under the facts as a reasonable officer *would perceive them.*" (emphasis in original)). Additionally, "[t]he calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

### 1.    Graham *Factors*

The "reasonableness" standard, although incapable "of precise definition or mechanical application," is ordinarily informed by three nonexclusive factors laid out by the Supreme Court in *Graham v. Connor*: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph*, 981 F.3d at 332 (quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted)).   Here, the first and third factors do not favor defendants because, as they concede, Deputy Murray was dispatched to respond to a medical emergency,[58] not to arrest plaintiff for any suspected crime.[59]   *See Joseph*, 981 F.3d at 333, 336 (holding that first *Graham* factor

---

[58]    R. Doc. 22-3 ¶ 4.

[59]    The Court notes that in *Harris v. Serpas*, the Fifth Circuit stated that because the plaintiff "was not being placed under arrest for any suspected crime[,] . . . the only *applicable* factor under *Graham* [was] whether [the plaintiff] 'posed an immediate threat to the safety of the officers or others.'"   745 F.3d 767, 772 (5th Cir. 2014) (emphasis added).   In holding that the officers were entitled to qualified immunity

weighed heavily in plaintiff's favor because "it [was] undisputed that [plaintiff] had not committed and was not committing any crime" (internal quotation marks omitted)); *see also Khansari v. City of Houston*, No. 13-2722, 2015 WL 6550832, at *8 (S.D. Tex. Oct. 28, 2015) (holding that because plaintiff "had committed no crime, had resisted medical treatment, but was not resisting arrest or attempting to flee[,] . . . the first and third *Graham* factors weigh[ed] against" the defendant).  The Court must still examine the remaining factor under *Graham*, *i.e.*, "whether [plaintiff] 'posed an immediate threat to the safety of the officers or others.'"  *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Graham*, 490 U.S. at 396) (finding qualified immunity when plaintiff posed a threat to the safety of officers even

---

on plaintiff's excessive force claim, the *Harris* court looked only at the second *Graham* factor.  *See id.* at 772-73.  Conversely, in *Joseph ex rel. Estate of Joseph v. Bartlett*, the Fifth Circuit stated that when the plaintiff was not suspected of committing any crime, the first *Graham* factor "weighed heavily in [the plaintiff's] favor."  981 F.3d at 333. Thus, there appears to be some disagreement as to whether the first and third factors should be disregarded as inapplicable when the plaintiff is not suspected of any crime or facing arrest, *see Harris*, 745 F.3d at 772, or whether those factors should automatically weigh in the plaintiff's favor, *see Joseph*, 981 F.3d at 333.  Given this ambiguity in the Fifth Circuit's approach, out of an abundance of caution, this Court will follow *Joseph*, and finds that the first and third *Graham* factors necessarily weigh in plaintiff's favor, leaving only the second factor for further consideration.  *See Malbrough v. Stelly*, 814 F. App'x 798, 803 (5th Cir. 2020) (noting that the second *Graham* factor "is the most important").

though plaintiff "was not being placed under arrest for any suspected crime").

          i.     *The first tasing*

Plaintiff asserts that Deputy Murray's first use of the taser was unprovoked, and, given his knowledge of the ongoing medical emergency and the absence of an immediate threat, Deputy Murray's use of force was objectively unreasonable. The evidence submitted by the parties, including Deputy Murray's body camera footage and witness statements, depict the events leading up to the first tasing and the tasing itself. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) ("The reasonableness inquiry is inherently factbound, making the video of this . . . event critical." (citation omitted)); *see also Scott*, 550 U.S. at 381 (holding that the court "should have viewed the facts in the light depicted by the videotape"). Using this evidence, and considering "only the facts that were knowable" to Deputy Murray at the time of the incident, *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam), the Court will examine the "totality of the circumstances" to assess whether Deputy Murray's first use of the taser was objectively reasonable and proportionate. *See Griggs*, 841 F.3d at 313; *see also Hatcher v. Bement*, 676 F. App'x 238, 243 (5th Cir. 2017) (recognizing that, in determining the

reasonableness of an officer's force at the moment force was used, the court must "consider the totality of the circumstances as perceived by 'a reasonable officer on the scene.'" (quoting *Graham*, 490 U.S. at 396)); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Excessive force claims are necessarily fact-intensive."); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight.").

At the start of the body camera footage, plaintiff can be seen lying in his bed, seemingly unresponsive.[60]   Once plaintiff eventually regained consciousness, it took several minutes for paramedics and family members to cajole him near the gurney, so that he could be transported to the hospital to receive further medical attention.[61]   Although plaintiff was not fully compliant with the paramedics' requests and displayed erratic behavior and disorientation, he did not pose an immediate threat at this time.   But the situation began to escalate when plaintiff, a relatively large man, began to physically resist first responders' efforts to place him on the gurney.[62] Plaintiff can be seen, as confirmed by witness statements submitted by

---

[60]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC2," at 3:18-6:37.

[61]   *Id.*, "Don Murray BC," at 00:00-6:51.

[62]   *Id.* at 7:20-7:50.

plaintiff,[63] pushing back against the first responders with his own body weight.[64]  At one point, plaintiff placed his arm on the chest of a fireman, causing the fireman to lose his footing and to stumble backwards.[65]  After the first responders were able to move plaintiff towards the gurney, plaintiff stood on top of the gurney, and his wife can be heard in the video pleading with plaintiff to not fall on her and injure her.[66]  Throughout the encounter, plaintiff's speech was mostly garbled and incoherent, and at one point he stated, "please, just let me go," as he resisted the repeated efforts and verbal instructions of at least four first responders and two family members for more than ten minutes to get him to sit on the gurney for transport to the hospital.[67]

After the efforts to subdue the disoriented and uncompliant plaintiff failed, a female paramedic approached plaintiff with a syringe in her hand.[68] She then unexpectedly attempted to inject plaintiff with Ketamine,[69] at

---

[63]   R. Doc. 26-7 ¶¶ 13, 18; R. Doc. 26-8 ¶¶ 8, 17.

[64]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 7:20-7:50.

[65]   *Id.* at 7:29-7:38.

[66]   *Id.* at 9:00-9:20.

[67]   *Id.* at 8:35-9:00.  *See also id.* at 0:00-9:51 (depicting paramedics' and other first responders' efforts in plaintiff's bedroom to get a now-conscious, but visibly confused and incoherent, plaintiff to be transported to the hospital).

[68]   *Id.* at 9:22-9:35.

[69]   R. Doc. 22-5 ¶ 5; R. Doc. 26-1.

which point plaintiff asked, "What's that sticking me?"[70]  Plaintiff grabbed the syringe from the EMT, who turned to other first responders in the bedroom and said, "he has my needle."[71]  The EMT further confirmed that she was unable to administer the contents of the syringe before plaintiff "yanked [her] needle."[72]

Seconds later, and with the syringe still in hand, plaintiff abruptly fled the bedroom while loudly screaming, eventually exiting out of the home and onto his front lawn.[73]  Plaintiff and his wife and son, who were present in the house at the time of the incident, assert that although plaintiff continued to hold the syringe as he fled his home, he never brandished or threatened anyone with it.[74]  The video evidence does not capture the seconds between when plaintiff grabbed the syringe and when he exited the house, and Deputy Murray does not offer any evidence to refute this assertion.  Instead, from the video evidence, Deputy Murray can be seen rushing out of the bedroom, pushing past paramedics and family members, to follow a now out-of-sight

---

[70]  R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 9:29-9:36; R. Doc. 3 ¶ 11; R. Doc. 24-6 ¶¶ 15-16.

[71]  R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 9:35-9:41.

[72]  *Id.* at 9:40-9:46.

[73]  *Id.* at 9:50-10:02; R. Doc. 26-7 ¶ 16; R. Doc. 26-8 ¶¶ 10, 12, 14.

[74]  R. Doc. 26 at 9-10; R. Doc. 26-7 ¶ 19; R. Doc. 26-8 ¶ 13.

plaintiff.[75]  About three seconds into his pursuit, Deputy Murray can be seen unholstering his taser gun just before exiting out of the front door.[76]  Once outside, plaintiff can be seen from Deputy Murray's body camera footage about halfway down a concrete walkway leading from the front door to the street, with his back facing Deputy Murray.[77]  It appears that plaintiff was moving towards the street when Deputy Murray exited the house.[78]  Deputy Murray then yelled out, "Sir," at which point plaintiff turned to face him, followed by a command to "get on the ground."[79]  Plaintiff can momentarily be seen on the body camera footage lifting his left hand holding a small white object, which plaintiff confirms was the syringe,[80] before lowering it to his side.[81]  Deputy Murray then began to raise his taser while pointing it at plaintiff, who was now facing Deputy Murray with his back towards a grassy area in his front yard.[82]  There was no one else visibly standing near plaintiff at this time.  Plaintiff can again briefly be seen lifting his left hand with the

---

[75]     R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 9:55-10:02.
[76]     *Id.* at 9:50-10:02.
[77]     *Id.* at 10:02-10:04.
[78]     *Id.*
[79]     *Id.* at 10:03-10:05.
[80]     Plaintiff confirms that he briefly raised his left hand, which held the syringe.  R. Doc. 26 at 11.
[81]     R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:04.
[82]     *Id.* at 10:05-10:06.

syringe before lowering both arms to his side.[83]  With his taser fully raised and aimed at plaintiff, Deputy Murray again ordered plaintiff to get on the ground, at which point plaintiff can be seen taking a few unbalanced steps backwards.[84]   Deputy Murray and at least one other law enforcement personnel reiterated the command to get on the ground four additional times,[85] after which Deputy Murray slowly announced, "Taser, Taser, Taser," before deploying the taser on plaintiff.[86]

With these facts in mind, and construing the evidence in a light favorable to plaintiff, the Court finds that Deputy Murray did not use excessive force against plaintiff when he first deployed his taser.   As discussed, the first and third *Graham* factors necessarily weigh against Deputy Murray because plaintiff was neither suspected of a crime nor under arrest.  *See Joseph*, 981 F.3d at 333, 336.  But "the second factor—whether there [was] an immediate threat to safety—is generally the most important factor in determining the objective reasonableness of an officer's use of [ ] force."  *Baker v. Coburn*, 68 F.4th 240, 247-48 (5th Cir. 2023) (citing *Harmon*, 16 F.4th at 1167); *see also Malbrough v. Stelly*, 814 F. App'x 798,

---

[83]   *Id.* at 10:05.

[84]   *Id.* at 10:05-10:06.

[85]   *Id.* at 10:05-10:10.

[86]   *Id.* at 10:10-10:15.

803 (5th Cir. 2020) (noting that the second *Graham* factor "is the most important").

Here, the Court finds that plaintiff posed a threat to the safety of the officers and others, and to himself. The video evidence shows, and witness statements confirm, that plaintiff was actively resisting medical care from the EMTs. He refused to be placed on the gurney so that he could be transported to the hospital, at times pushing or falling against first responders, placing them at risk of physical injury. And when he stood up on the gurney in his bedroom, plaintiff not only placed himself at risk of harm from falling but also risked harm to his wife and others who stood nearby. Most importantly, when plaintiff grabbed the syringe from the EMT, he endangered the safety of others standing around him who were at risk of being accidentally stuck with the needle. Furthermore, after plaintiff abruptly and frantically fled his home, he continued to possess the syringe while unrestrained and in close proximity to the officers.[87] *See Salazar v. Molina*, 37 F.4th 278, 283-84 (5th Cir. 2022) (finding substantial threat to safety of officers "when a suspect is unrestrained, in close proximity to the

---

[87]   Plaintiff's expert report acknowledges that plaintiff "had the ability to cause harm in that he lacked any apparent physical limitations which could preclude him from jabbing someone with the syringe," and that plaintiff "had the opportunity to cause harm" by standing in close proximity to the officers. R. Doc. 26-12 at 16.

officers, and potentially in possession of a weapon"); *Ramirez v. Escajeda*, 44 F.4th 287, 289 (5th Cir. 2022) (holding that it was objectively reasonable for an officer, responding to a 9-1-1 call regarding a suicidal man, to tase the man when the man was out of custody and the officer feared he had a weapon, creating an increased threat of harm).

Plaintiff asserts that there is a factual issue as to whether he wielded the syringe in an aggressive or threatening manner.[88]  But the video evidence clearly shows plaintiff twice lifting his hand that held the syringe while interacting with Deputy Murray, which Deputy Murray may have reasonably considered to be a threat. *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("A court . . . need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" (quoting *Scott*, 550 U.S. at 381).  And even if plaintiff's gestures alone could not reasonably be perceived as a direct threat to the safety of Deputy Murray and others standing nearby, the Court finds that plaintiff's possession of the syringe while unrestrained and in a confused, volatile state necessarily posed a threat to their safety.  *See Cadena v. Ray*, 728 F. App'x 293, 296 (5th Cir. 2018) (holding that plaintiff's "intoxicated state and erratic behavior gave the [o]fficers further reason to

---

88      R. Doc. 26-1 ¶ 12.

believe he was a threat").  Indeed, the Court can conceive of a number of dangerous and hazardous outcomes that could have resulted from the uncontrolled situation. *See, e.g.*, *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314-15 (6th Cir. 2017) (discussing risk to paramedics and plaintiff due to blood spraying from plaintiff's arm after he ripped an IV catheter from his arm, including risk of contracting hepatitis C or HIV).

Moreover, plaintiff's mental state and combative actions, including fleeing from his home in a disoriented state and while holding a syringe, posed an immediate threat to plaintiff's own safety.  It is evident that plaintiff was in need of urgent medical attention, and that his prolonged resistance to the efforts of numerous paramedics and other first responders to transport him to a hospital put his health and safety at risk.  Further, after he fled from his home, plaintiff was moving towards the street in a highly disoriented state, where he could be injured by oncoming cars.  Therefore, plaintiff's "mental and physical state rendered him[,] at a minimum, a threat to his own safety." *Id.* at 315 (citation and internal quotation marks omitted) (cleaned up).  Considering these circumstances, the Court finds that the second *Graham* factor weighs heavily in favor of Deputy Murray.

Additionally, the Supreme Court and Fifth Circuit have recognized that the *Graham* factors, while instructive, are not exhaustive of the totality of the

28

circumstances that a court may consider in its determination of excessive force. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Frank v. Parnell*, No. 22-30408, 2023 WL 5814938, at *3 (5th Cir. Sept. 8, 2023) (per curiam); *Solis v. Serrett*, 31 F.4th 975, 982-83 (5th Cir. 2022). The Court may therefore consider other relevant factors, including "the relationship between the need for the use of force and the amount of force used; the extent of [ ] plaintiff's injury; any effort made by [Deputy Murray] to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by [Deputy Murray]; and whether [ ] plaintiff was actively resisting," among other factors. *Kingsley*, 576 U.S. at 397, *cited with approval in Frank*, 2023 WL 5814938, at *3; *see also Solis*, 31 F.4th at 983 ("Although not listed in the *Graham* factors, courts also consider the speed with which officers resort to force."); *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) (recognizing that "[m]any factors are relevant" to the clearly excessive and objectively unreasonable use of force inquiry).

Here, the Court will first examine the severity of plaintiff's injuries. *See Brown v. Lippard*, 472 F.3d 384, 386-87 (5th Cir. 2006) ("In evaluating excessive force claims, courts may look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified

infliction as is tantamount to a knowing willingness that it occur.'" (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986))); *see also Deville*, 567 F.3d at 168 ("'[T]he extent of the injury inflicted' may be considered in determining whether the officers used excessive force." (quoting *Whitley*, 475 U.S. at 321) (cleaned up)).  Plaintiff asserts that he sustained a subdural hematoma and unspecified injuries to his back and other parts of his body, as well as emotional pain and suffering.[89]  The Fifth Circuit has held that incidental injuries such as abrasions, back and neck pain, bruising, and mental anguish "are properly characterized as 'minor' for purposes of excessive-force analysis." *Buehler v. Dear*, 27 F.4th 969, 982-83 (5th Cir. 2022).  Therefore, plaintiff's general and conclusory allegations that he suffered unspecified injuries to his back and other parts of his body, which were not documented in the medical records submitted by plaintiff,[90] as well as his claims of mental anguish, are not sufficient to show that he suffered anything more than a *de minimis* injury.  *See id.*  But there is evidence that plaintiff sustained other physical injuries, including a subdural hemorrhage, as a result of Deputy Murray's use of force.[91]  The Court finds this injury more than *de minimus*.  *See Samples v. Vadzemniek*, 900 F.3d 655, 660 (5th Cir. 2018)

---

[89]   R. Doc. 3 ¶¶ 29, 31; R. Doc. 26-9 at 2.
[90]   R. Doc. 26-9.
[91]   *Id.* at 2.

("[Defendant] does not dispute that [plaintiff's] subdural hematoma is a sufficient injury to ground a claim of excessive force, for under our prevailing caselaw it is."); *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (holding that plaintiff's allegations and medical records stated more than a *de minimis* injury when they revealed plaintiff received treatment for contusions, acute strains, and bruised ribs and continued to experience pain).

Next, the Court considers the efforts of Deputy Murray "to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397. It is clear from Deputy Murray's body camera that he and at least one other officer attempted to deescalate the situation by repeatedly giving plaintiff verbal commands to get on the ground before deploying the taser. The evidence therefore confirms that Deputy Murray "did not 'immediately resort[ ] to [the taser] . . . without attempting to use physical skill, negotiation, or even commands.'" *Betts v. Brennan*, 22 F.4th 577, 583 (5th Cir. 2022) (quoting *Newman*, 703 F.3d at 763) (alterations in original). Plaintiff nevertheless argues that the speed with which Deputy Murray resorted to the use of his taser following his first verbal command was unreasonable.[92] Although Deputy Murray resorted to the use of his taser ten seconds after he first

---

[92]   R. Doc. 26 at 28.

ordered plaintiff to get on the ground,[93] the evidence in the record supports an objectively reasonable belief that the use of some force, beyond mere verbal commands, was necessary to gain plaintiff's compliance. This is particularly evident because plaintiff's "adverse course of conduct leading up" to the first tasing—including his prolonged noncompliance with paramedics' efforts to render medical attention, physical altercations with first responders in the bedroom, and abrupt fleeing from the home while holding a syringe that he grabbed from an EMT—"may have indicated to [Deputy Murray] that [plaintiff] would not submit" to further verbal commands. *Solis*, 31 F.4th at 983 (finding that an officer's belief that plaintiff would not submit to arrest was "well-founded" when she repeatedly resisted the officer's orders); *cf. Crane*, 50 F.4th at 464 ("[T]his Court considers the speed with which an officer resorts to force where officers deliberately, and rapidly, eschew lesser responses when such means are *plainly available and obviously recommended by the situation*." (emphasis added) (citation omitted)).

Furthermore, Deputy Murray was faced with a situation in which he was forced to make a "split-second decision" about how to subdue plaintiff,

---

[93]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:04-10:14.

who was unrestrained, mentally incapacitated, holding a needle, and at risk of further escaping. *Graham*, 490 U.S. at 396; *cf. Doss v. Helpenstell*, 626 F. App'x 453, 459-60 (5th Cir. 2015) (holding that an officer should receive no qualified immunity if he "quickly escalate[s]" an encounter with a non-threatening, passively resisting driver who poses little risk of escape by employing overwhelming force "rather than continu[ing] to negotiate"). Under factually similar circumstances, the Fifth Circuit has held that it was objectively reasonable for an officer to deploy his taser multiple times to subdue an incoherent individual who failed to comply with repeated orders to get on the ground, even when the person was unarmed. *Carroll v. Ellington*, 800 F.3d 154, 174 (5th Cir. 2015). In such situations, continuing verbal negotiations with a person who is clearly disoriented and incapable of comprehending such commands would be futile and, therefore, not "obviously recommended by the situation." *Crane*, 50 F.4th at 464. Thus, the circumstances suggest that Deputy Murray's use of the taser was not an unreasonable or hasty resort to force. *See Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016) (holding that officers were reasonable in using tasers when there was evidence of "measured and ascending" action and "neither officer used [his] taser as the first method to gain [the arrestee's] compliance"); *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th

Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him.").

Finally, the Court must examine "the relationship between the need and the amount of force used." *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999) (internal quotation marks omitted)). "The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive." *Joseph*, 981 F.3d at 332 (citations omitted); *see also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) (internal quotation marks omitted))). While the surrounding circumstances, including a person's noncompliance, "may indicate that physical force is justified, officers must also select the appropriate "*degree* of force." *Joseph*, 981 F.3d at 332 (emphasis in original) (quoting *Deville*, 567 F.3d at 167-68). As the Fifth Circuit in *Joseph ex rel. Estate of Joseph v. Bartlett* explained:

> To stay within constitutional bounds, an officer must use force "with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance." Therefore, force may be less justified or unjustified when a suspect engages

> in "passive resistance," as opposed to "active resistance." As to a passively resisting suspect, an officer does not take measured and ascending action by "immediately resorting to taser and nightstick without attempting to use physical skill, negotiation, or even commands."

*Id.* (footnotes omitted) (first quoting *Poole*, 691 F.3d at 629; then quoting *Deville*, 567 F.3d at 167; and then quoting *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)) (cleaned up).

Here, some degree of force was reasonably necessary to ameliorate the immediate threat to the first responders and others, and to plaintiff himself. Because plaintiff's medical condition caused disorientation and confusion, plaintiff resisted paramedics' attempts to render medical care. Plaintiff managed to push back against several large men in the bedroom who were attempting to place him on the gurney. He unexpectedly stood unsteadily on top of the gurney, posing a risk of harm to himself and others if he fell. Ultimately, the paramedics were not able to gain control of plaintiff before he fled his house screaming or able to take back the syringe that plaintiff had grabbed from the EMT. And despite a total of six separate commands by law enforcement officers for plaintiff to get on the ground, plaintiff did not comply, instead continuing to stand outside, near a public street, while holding the syringe. Given these circumstances and Deputy Murray's observations of a disoriented and generally combative plaintiff, it was

reasonable for Deputy Murray to perceive plaintiff as an immediate threat, particularly to plaintiff's own health and safety. The purpose of trying to subdue him was to get him to a hospital where he could receive medical attention. *See Griggs*, 841 F.3d at 313; *see also Ramirez v. Knoulton*, 542 F.3d 124, 131 (5th Cir. 2008) (finding that officer reasonably perceived a threat to safety when he was previously "on notice that [the victim] was armed, emotionally unstable, and potentially suicidal"). Therefore, the Court finds that some degree of force by Deputy Murray was reasonably necessary to protect bystanders and, more importantly, to ensure plaintiff's safety and wellbeing.

Plaintiff contends that at the time of the first tasing, he was merely passively resisting the officers' commands to get on the ground.[94] Plaintiff asserts that although he initially fled his house, his flight had ended at the time of the first tasing, and he was not showing signs of violence or otherwise actively resisting.[95] Plaintiff also asserts that his continued possession of the syringe did not constitute resistance justifying the use of force because neither Deputy Murray nor any other officer ordered him to drop the syringe before deploying the taser. Additionally, plaintiff contends that Deputy

---

[94]   R. Doc. 26 at 19-20.

[95]   *Id.*

Murray knew that plaintiff was cognitively impaired because Deputy Murray had observed plaintiff's "childlike behavior for more than twenty minutes" before he tased plaintiff.[96]  Under these circumstances, plaintiff asserts that a reasonable officer would have known that immediately resorting to tasing the sixty-five-year-old plaintiff was clearly excessive.[97]

The video evidence submitted by both parties corroborates plaintiff's statement that he was no longer actively fleeing at the precise moment when Deputy Murray resorted to the first use of the taser.  After Deputy Murray exited plaintiff's house and began speaking to plaintiff, plaintiff stopped moving towards the street and turned to face Deputy Murray, taking several steps backwards onto the grass in his front yard.[98]  But it is noteworthy that less than thirty seconds had elapsed between when plaintiff first fled the bedroom and when Deputy Murray first deployed his taser.[99]  This short period of time between these moments highlights the "rapidly evolving" nature of the entire incident.  *See Graham*, 490 U.S. at 397; *Curran v. Aleshire*, 800 F.3d 656, 662 (5th Cir. 2015); *cf. Joseph*, 981 F.3d at 335 (recognizing Fifth Circuit precedent that if "enough time had lapsed"

---

[96]     *Id.* at 20.

[97]     *Id.*

[98]     R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:03-10:06.

[99]     *Id.* at 9:51-10:14.

between active resistance and use of force such that "it was obvious that the suspect was no longer resisting, the officer's force could not have been reasonable" (first citing *Curran*, 800 F.3d at 661; and then citing *Mason*, 806 F.3d at 277)).

And although plaintiff was no longer in active flight from the first responders when Deputy Murray deployed his taser, plaintiff was by no means subdued.  Plaintiff ignored six separate commands to get on the ground, and he was not otherwise restrained such that he lacked "any means of evading custody." *Joseph*, 981 F.3d at 335; *cf. Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016) (finding excessive force when officer did not release his police dog's bite until after handcuffing the suspect because the suspect was physically unable to evade custody).  Plaintiff had also managed to physically thwart the repeated efforts of paramedics, his family, and other first responders to restrain or subdue him, as shown on the body camera footage and attested to by several witnesses.[100]  Under these circumstances, some degree of force was reasonably necessary.

Moreover, Deputy Murray's use of non-lethal force when he first tased plaintiff for about five seconds was not an excessive degree of force.  The Fifth Circuit has held a plaintiff's active resistance to police orders and refusal to

---

[100]    R. Doc. 26-7 ¶¶ 13, 16, 18; R. Doc. 26-8 ¶¶ 8-9, 11, 17.

comply may justify this degree of force.  For example, in *Pratt v. Harris County*, 822 F.3d 174 (5th Cir. 2016), the court ruled that two officers were reasonable in tasing an arrestee because he had "aggressively evaded [their] attempts to apprehend him," and because they did so after the arrestee "continuously failed to comply," other "efforts to subdue" him had failed, and the arrestee had "continued to resist handcuffing" and "kicked an officer after being taken to the ground."  *Id.* at 182; *see also Poole*, 691 F.3d at 639 ("Because [plaintiff], upon refusing to turn around and be handcuffed, posed an immediate threat to the safety of the officers and actively resist[ed] the officers' instructions, the use of force was not clearly excessive." (citation and internal quotation marks omitted) (alteration in original)).

The Court therefore finds that, under the totality of the circumstances, and drawing all reasonable inferences in plaintiff's favor, Deputy Murray's first use of the taser was not clearly excessive or objectively unreasonable. While the facts confirm that Deputy Murray was aware of plaintiff's medical condition and suggest that he knew or should have known that plaintiff's volatile behavior was caused by the ongoing medical emergency, this knowledge alone does not make Deputy Murray's use of force unreasonable or clearly excessive.  At the time Deputy Murray first deployed his taser, plaintiff was unrestrained and unsubdued, had fled from first responders

moments before while carrying a syringe, had not complied with officers' verbal commands, continued to hold the syringe in his hand, and continued to refuse necessary medical treatment. The Court therefore concludes that a reasonable officer on the scene, without the "20/20 vision of hindsight," would be justified in taking the same actions as Deputy Murray when he first deployed his taser. *See Graham*, 490 U.S. at 396; *see also Miracle*, 853 F.3d at 315-16 (holding that officer's use of force was objectively reasonable given that "[f]our paramedics were unable to physically restrain [the plaintiff], whose health was rapidly deteriorating and who was unresponsive to [the officer's] command to 'relax'"). Accordingly, the facts of this case do not show that Deputy Murray violated plaintiff's Fourth Amendment right to be free from the use of clearly excessive and objectively unreasonable force when he first tased plaintiff. Because plaintiff fails to meet his burden under the first prong of the qualified immunity inquiry, Deputy Murray is entitled to qualified immunity on plaintiff's § 1983 claim of excessive force as to the first tasing. *See Cole*, 935 F.3d at 451.

ii.   *The second tasing*

After Deputy Murray first deployed his taser, plaintiff immediately fell to the ground on his back with his legs stretched out and his arms crossed

40

over his chest.[101]   The first tasing can be heard to cycle for about five seconds,[102] during which Deputy Murray instructed two nearby officers to approach plaintiff and turn him over.[103]   There is a pause in the taser cycle and Deputy Murray again commands the officers to turn plaintiff over.[104] Before the officers could reach plaintiff, the video shows plaintiff begin to move again, bending both of his knees and reaching towards the bottom of his shorts with his right hand.[105]   It is unclear from the footage whether plaintiff remained in possession of the syringe.   At this moment, Deputy Murray deployed his taser for a second time.[106]   The second tasing transpired about three-and-a-half seconds after the first taser cycle ended.[107]

---

[101]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:15-10:17.

[102]   *Id.* at 10:15-10:19; *see also* R. Doc. 26-5 (Taser Report) (indicating a duration of 4.96 seconds for the first taser deployment).

[103]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:15-10:19.

[104]   *Id.*

[105]   *Id.* at 10:16-10:21.

[106]   *Id.* at 10:21.   In Deputy Trevigne's incident report, he states plaintiff was tasered for a second five-second cycle, and that "the second set of probes were deployed but neither probes made contact to [plaintiff]." R. Doc. 26-4 at 3.   Nevertheless, based upon the parties' statements of facts, there does not appear to be a dispute that plaintiff was tasered a second time using the same taser prongs that were deployed from the first tasing.   R. Doc. 26-5 ¶ 13; R. Doc. 26-1.

[107]   R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:14-10:21; *see also* R. Doc. 26-5 at 3 (Taser Report) (indicating that the first tasing ceased at 42:38.958, and the trigger was pulled for the second tasing at 42:42.557).

Although the Court has concluded that Deputy Murray's first use of the taser was reasonable under the circumstances, the Court must now determine whether the second taser deployment was justified. *See Lytle*, 560 F.3d at 413 ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."); *see also Carroll*, 800 F.3d at 174, 176-78 (granting qualified immunity for one officer's initial taser use but not others' subsequent uses of force); *Curran v. Aleshire*, 800 F.3d 656, 660 (5th Cir. 2015) (addressing each use of force separately); *Franklin v. City of Southfield*, 808 F. App'x 366, 370 (6th Cir. 2020) (assessing the objective reasonableness of each taser deployment separately); *Lachance v. Town of Charlton*, 990 F.3d 14, 24 (1st Cir. 2021) (collecting circuit court cases using segmented approach to analyze reasonableness of separate instances of force).   Drawing all reasonable inferences in plaintiff's favor, the Court finds that the second tasing was not a violation of plaintiff's Fourth Amendment right to be free from excessive force.

First, mere seconds had elapsed between the first and second tasing. This short window of time between these moments highlights the "rapidly evolving" nature of the entire incident, which required Deputy Murray to make a "split-second" decision to deploy his taser for a second time.

*Graham*, 490 U.S. at 397.   Indeed, the Fifth Circuit has "repeatedly recognized" that "officers are afforded considerable latitude in 'tense, uncertain, and rapidly evolving' situations," particularly when a plaintiff continues to resist or present a threat at the time of the force. *Curran*, 800 F.3d 656, 662 (5th Cir. 2015) (quoting *Poole*, 691 F.3d at 625-26); *see also Lytle*, 560 F.3d at 413-14 (reaffirming that the relevant "justification for the use of force" is the officer's reasonable perception of a threat of harm, and noting that it's reasonable to use defensive force where insufficient time has elapsed "for the officer to perceive new information indicating the threat was past").

Additionally, although plaintiff had fallen to the ground after the first tasing, he had not been subdued or otherwise restrained such that first responders could initiate treatment.  *See Callwood v. Jones*, 727 F. App'x 552, 559-60 (11th Cir. 2018) ("[T]he point at which a suspect falls to the ground . . . is not the dividing point between excessive and non-excessive force.  Instead that point usually turns on whether the suspect is completely restrained or otherwise resisting arrest."); *cf. Joseph*, 981 F.3d at 335 ("Force must be reduced once a suspect has been subdued.").  Despite having already been tased once, plaintiff showed signs of what could be interpreted as continued resistance.  As noted, the video evidence shows that as two other

officers approached plaintiff to attempt to place him in handcuffs, and as Deputy Murray instructed them to turn plaintiff over, plaintiff suddenly bent both of his knees and reached towards his right leg.[108]  Deputy Murray could have reasonably interpreted plaintiff's sudden movements while the other officers approached him "as an escalation of resistance, justifying the second taser shot as a proportional response." *Cadena*, 728 F. App'x at 297.  This is particularly true because moments before, Deputy Murray had observed plaintiff holding a syringe, and it would be reasonable for Deputy Murray to believe that plaintiff could harm one of the officers with the syringe or otherwise when plaintiff suddenly moved as the officers approached and stood over him.  Under these tense and rapidly evolving circumstances, it was objectively reasonable for Deputy Murray to perceive the unsubdued plaintiff as a threat to the safety of both the officers and to perceive plaintiff's actions as a form of resistance in the moments before the second tasing. Given Deputy Murray's knowledge of plaintiff's prolonged resistance and lack of cooperation, it was reasonable for Deputy Murray to believe plaintiff was continuing to resist or potentially attempting to flee when plaintiff suddenly moved before the approaching officers could turn him over to be

---

[108]    R. Docs. 23 & 26-3 (manual attachments), "Don Murray BC," at 10:16-10:21.

handcuffed.  The Court therefore finds that reasonable minds could not conclude that Deputy Murray's use of nonlethal force to attempt to subdue plaintiff so that he could be transported to the hospital for treatment was objectively unreasonable and clearly excessive under the circumstances. *See Cloud*, 993 F.3d at 384086 (holding that an officers use of a taser was reasonable when suspect "took a confrontational stance, deprived [the officer] of the use of his handcuffs, and thwarted efforts to complete the arrest"); *see also Sanford v. Kirst*, No. 21-347, 2023 WL 4052957, at *26 (M.D. La. June 16, 2023) (holding that an officers use of nonlethal force to subdue an uncooperative suspect was reasonable, particularly because the plaintiff "had previously been violent and extremely non-cooperative, thus making it reasonable for [the officer] to believe [the plaintiff] may have been both resisting the leg shackles and attempting to flee" when he suddenly turned his body and took a step).

The Court further recognizes that although plaintiff argues that he was neither resisting nor non-compliant when Deputy Murray tased him for the second time, this is refuted by the video evidence. *See Scott*, 550 U.S. at 378-381.  As discussed, plaintiff's movements could appear to be a resumption of physical resistance immediately before the second tasing.  And even after having been tased twice, plaintiff did not immediately submit to the officers'

efforts to handcuff him so that he could be safely transported to the hospital. Plaintiff continued to struggle and yell in protest, even when strapped onto the gurney.

The Court therefore finds that Deputy Murray's second use of the taser was objectively reasonable and not clearly excessive. *See Salazar*, 37 F.4th at 283-84 (holding that an officer's use of a taser before handcuffing a "previously noncompliant suspect in close physical proximity to officers," and who was "unrestrained at night in the open," was objectively reasonable). Accordingly, on the undisputed facts, plaintiff cannot show that Deputy Murray violated his Fourth Amendment right.

### 2. Estate of Hill by Hill v. Miracle *factors*

The Court also notes that several circuits have recently recognized the limitations of the traditional *Graham* factors when considering an excessive force claim in the medical-emergency context. *See, e.g.*, *Miracle*, 853 F.3d at 314; *Helm v. Rainbow City*, 989 F.3d 1265, 1273 (11th Cir. 2021); *see also Lachance v. Town of Charlton*, 990 F.3d 14, 26 (1st Cir. 2021) (recognizing that "the *Graham* test is geared toward criminal suspects as opposed to persons who are suspected of experiencing a medical emergency for which they require aide"). Specifically, these courts have acknowledged that there

are circumstances when a case does not fit neatly "within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer." *Miracle*, 853 F.3d at 314. For instance, in a case such as this involving an officer's response to a medical emergency, "the traditional excessiveness test does not lend itself to analyzing use of force." *Helm*, 989 F.3d at 1273 (discussing the Sixth Circuit's holding in *Miracle*). Because plaintiff had not committed and was not committing any crime, and was not under arrest, the first and third *Graham* factors automatically disfavor Deputy Murray, leaving only the second "safety" factor for meaningful consideration. *See Miracle*, 853 F.3d at 313 (recognizing that applying the traditional *Graham* factors to the medical emergency context would be the "equivalent to a baseball player entering the batter's box with two strikes already against him," because "two of the three *Graham* factors automatically weighed against [the defendant]").

While the Fifth Circuit has not squarely addressed this issue, the Sixth Circuit, recognizing the flexibility of *Graham*, has proposed that a "more tailored set of factors be considered in the medical-emergency context." *Miracle*, 853 F.3d at 314. In *Estate of Hill by Hill v. Miracle*, 853 F.3d 306 (6th Cir. 2017), the Sixth Circuit confronted the question of whether a police

47

officer who responded to a medical emergency used excessive force when he tased the plaintiff, who was suffering from a diabetic episode and being treated by medical personnel in his home. *Id.* at 310, 314-15. Recognizing the difficulty in applying the *Graham* factors to the facts of the case, the court articulated an alternative set of considerations to assist in its analysis of the use of force:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.* at 314. "If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.*

Applying these factors, the *Miracle* court held that the officer's use of force was reasonable under the circumstances and that the officer was therefore entitled to qualified immunity on the plaintiff's § 1983 excessive force claim. *Id.* As to the first factor, the Sixth Circuit found that the plaintiff was incapable of making rational decisions because his hypoglycemia caused disorientation and extreme agitation. *Id.* Additionally, the plaintiff had

48

resisted medical care, repeatedly kicked his feet and swung his fists at paramedics, and ripped an IV catheter out of his arm. *Id.* The court recognized that plaintiff's violent resistance to life-saving treatment and combative behavior not only posed a threat to the plaintiff's own wellbeing but also to the safety of the paramedics. *Id.* at 314-15. Examining the second factor, the court found that some degree of force was necessary to protect the paramedics and to save the plaintiff's life. *Id.* at 315. While the district court found that any danger posed by the plaintiff could have been eliminated by "simply stepping away from [him]," the Sixth Circuit rejected this "proposed action" because it failed to account for plaintiff's need for immediate medical assistance. *Id.* ("So stepping away from [the plaintiff] might have eliminated the safety risk to the paramedics and to [the officer], but it would have had potentially fatal consequences for [the plaintiff].").   Finally, as to the "excessiveness" factor, the court determined that the officer's single use of a taser was objectively reasonable given the need to render immediate medical assistance and given the paramedics' failed efforts to render such assistance and to physically restrain the plaintiff. *Id.*

Here, as in *Miracle*, there is no doubt plaintiff was experiencing a medical emergency and was incapable of making rational decisions due to

his altered state, as confirmed by multiple witnesses.[109]  Deputy Murray's declaration further confirms that he was dispatched to respond to a medical emergency, and he describes plaintiff as having been "incoherent" and unresponsive on the scene.[110]  And Deputy Murray's use of the taser was not for law enforcement purposes, but to subdue a disoriented and agitated individual experiencing a medical emergency.  *See id.* at 314.  Given these unique circumstances, an analysis under the *Miracle* framework lends further support to this Court's conclusion that Deputy Murray did not violate plaintiff's Fourth Amendment right.  *See Smith v. City of Greensboro*, No. 19-CV-386, 2020 WL 1452114, at *6 (M.D.N.C. Mar. 25, 2020) (utilizing *Miracle* test in medical-emergency context); *Wiley v. City of Columbus*, 545 F. Supp. 3d 567, 577-78 (S.D. Ohio 2021) (same); *Napier v. Cnty. Comm'n of Lincoln Cnty.*, No. 18-0254, 2019 WL 2144810, at *3 (S.D.W.V. May 16, 2019) (same); *Est. of Williams v. Douglas Cnty.*, No. 16-CV-2913, 2018 WL 9848045, at *12 (N.D. Ga. Sept. 6, 2018) (same).

---

[109]     R. Doc. 26-4 at 3; R. Doc. 26-7 ¶¶ 12-14; R. Doc. 26-8 ¶¶ 5, 8, 17.
[110]     R. Doc. 22-3 at 2.

**B.    Clearly Established**

Because Deputy Murray did not violate plaintiff's Fourth Amendment rights, the Court need not reach the second prong of the qualified immunity analysis—whether the right was clearly established.  *See Cole*, 935 F.3d at 451.  Nevertheless, even assuming *arguendo* that Deputy Murray did violate plaintiff's Fourth Amendment rights, plaintiff fails show that the Deputy Murray's conduct violated clearly established law.

"An official violates clearly established law if 'then-existing precedent' establishes that the officer's conduct constituted a constitutional violation." *Boyd v. McNamara*, 74 F.4th 662, 667 (5th Cir. 2023) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)).  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), *cited with approval in Ramirez*, 3 F.4th at 133; *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." (citation and internal quotation marks omitted)).  In other words, the plaintiff must "'identify a case'—usually, a 'body of relevant case law'—in which 'an officer acting under similar

circumstances was held to have violated the Constitution.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 583 U.S. at 64) (cleaned up); *see also al-Kidd*, 563 U.S. at 742 (recognizing that "clearly established" requires controlling authority or "a robust 'consensus of cases of persuasive authority'" (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))); *Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("Fair notice requires clearly established law.  That is, the law must 'clearly prohibit the officer's conduct in the particular circumstances before him' so 'every reasonable official' knows not to engage in that conduct." (quoting *Wesby*, 583 U.S. at 63)); *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (holding that clearly established law requires controlling authority, or a robust consensus of persuasive authority, "that defines the contours of the right in question with a high degree of particularity"); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021) ("Precedent involving similar facts can help move a case beyond the otherwise hazy borders between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam) (internal quotation marks omitted))).   "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on

whether a right is clearly established as to the specific facts of the case."
*Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Absent a closely analogous controlling case, or a consensus of persuasive cases, that places the constitutional violation "beyond debate," a plaintiff's claims are barred by the doctrine of qualified immunity unless it is a "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 63 (citations and internal quotation marks omitted); *see also Joseph*, 981 F.3d at 330 (recognizing "the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear" (citation and internal quotation marks omitted)). The facts of this case do not place it in the rare category of an obvious constitutional violation. *See* discussion, *supra*, pgs. 20-46. Accordingly, the Court must identify a controlling case, or a robust consensus of persuasive authority, where an officer acting under similar circumstances to those at issue was held to have violated the Fourth Amendment right to be free from excessive force. *See Wesby*, 583 U.S. at 64 (citations omitted); *see also Joseph*, 981 F.3d at 338 ("While we needn't limit our analysis to the cases cited by Plaintiffs, we must explain why the cases

we identify prohibited the challenged conduct in this case.").  The authority must pre-date the events of the case to provide Deputy Murray with fair notice of his legal obligations.  *See Pearson*, 555 U.S. at 232 (holding that the law must be clearly established "at the time of the defendant's alleged misconduct").  Surveying the body of the law as of April 13, 2022, the Court concludes that it was not clearly established that it was unconstitutional to tase plaintiff under the facts of this case.

Plaintiff cites several Fifth Circuit cases in support of his position that clearly established law demonstrates that an officer violates the Fourth Amendment when he deploys a taser, or resorts to other physical force, on a person who has been subdued and is not actively resisting.[111]  Plaintiff is correct that it was clearly established at the time of Deputy Murray's conduct that "[a]n officer cannot use force against a citizen who has 'committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command.'"  *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (quoting *Newman v. Guedry*, 703 F.3d 757, 762, 764 (5th Cir. 2012)) (collecting cases to support holding that in 2019, "it was clearly established that an officer may not use force on a [person] who is complying with his commands").  Indeed, the Fifth Circuit has repeatedly held that

---

[111]     R. Doc. 26 at 21-27.

when a suspect initially resists, any subsequent use of force "must be reduced once [he] has been subdued." *Joseph*, 981 F.3d at 335 (first citing *Cooper*, 844 F.3d at 524; and then citing *Carroll*, 800 F.3d at 178).  After the suspect has been "subdued" and is "no longer resisting, an officer's subsequent use of force is excessive." *Carroll*, 800 F.3d at 177; *see also Joseph*, 981 F.3d at 341 (holding that "continuing to inflict force despite [a suspect's] committing no crime, posing no threat, and giving no active resistance" violates clearly established law); *Newman*, 703 F.3d at 764 n.8 (holding that officer "should have known that he could not continue to shock the suspect with the taser after he was no longer resisting arrest" (cleaned up)).  And when an individual "poses no immediate threat or flight risk," and "engages in, at most, passive resistance," the Fifth Circuit has held that, under clearly established law, an officer violates the Fourth Amendment by "abruptly resort[ing] to overwhelming physical force rather than continuing verbal negotiations." *Hanks*, 853 F.3d at 747 (first citing *Deville*, 567 F.3d at 167-69; then citing *Doss v. Helpenstell*, 626 F. App'x 453, 459-60 (5th Cir. 2015); and then citing *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016)).

But under Fifth Circuit precedent, it was not clearly established at the time of Deputy Murray's conduct that an officer violates the Fourth Amendment right to be free from excessive force when using a taser against

a subject who presents a real threat to himself and/or the safety of others and who is resisting, uncooperative, unrestrained, and unstable, and the use of force is preceded by some form of verbal negotiation.  For example, in *Cloud v. Stone*, 993 F.3d 379 (5th Cir. 2021), the Fifth Circuit held that officers may properly use "measured and ascending actions," including the use of a taser, "that correspond to [an uncooperative arrestee's] escalating verbal and physical resistance."  *Id.* at 384.  There, the arrestee, Cloud, was pulled over for a minor traffic offense and refused to sign the ticket, which is a crime in Louisiana.  *Id.* at 382.  The officer moved to arrest Cloud and had handcuffed only "his left wrist, at which point Cloud turned partially around to his left."  *Id.*  The officer then "ordered Cloud to turn back around and reached for his right hand to finish handcuffing him[,] . . . [b]ut Cloud then spun all the way around, turning away from [the officer's] reach and facing him head-on, with the handcuffs hanging from his left wrist."  *Id.*  The officer "stepped a few feet back and tased Cloud in the chest."  *Id.*  Cloud yelled and pulled the prongs from his chest, after which the officer grabbed Cloud around the waist and tased him again with the taser in "drive-stun" mode.  *Id.*  The Fifth Circuit held that the evidence showed that Cloud "actively resisted arrest," which gave the officer "reasonable grounds to tase him."  *Id.* at 385.  In reaching this conclusion, the court distinguished Cloud's actions from those of a

person who is merely passively resisting.  *Id.* at 386.  Specifically, the court stated that Cloud "was more than merely uncooperative or argumentative: his actions—not just his failure to follow directions—prevented [the officer] from completing a lawful arrest." *Id.*

In reaching its conclusion, the court in *Cloud* discussed Fifth Circuit precedent establishing the reasonableness of the use of nonlethal force on a person who is actively resisting law enforcement:

> Our cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to a taser.  Where . . . the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force.  For example, we have held that two officers were reasonable to tase an arrestee because he had "aggressively evaded [their] attempts to apprehend him," and because they did so after the arrestee "continuously failed to comply," other "efforts to subdue [him] were ineffective," and the arrestee had "continued to resist handcuffing" and "kicked an officer after being taken to the ground." *Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016).  In that case, we took as further evidence of "measured and ascending" action that "neither officer used [his] taser as the first method to gain [the arrestee's] compliance." *Ibid.*; *see also Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him.").  In another case – one not involving a taser but nonetheless relevant – we held that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, because the arrestee "resisted when [the officer] attempted to place handcuffs on him." *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009).  Specifically, the arrestee had "pulled his hand back and turned away from the officer," then grappled with him briefly. *Id.* at 216.

*Id.* at 384-85 (alterations in original).

Even more analogous is *Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015), in which an officer repeatedly deployed a taser on a schizophrenic man who was incoherent and spoke incomprehensibly such that the officer believed him to be on drugs.  *Id.* at 162-63.  The officer in *Carroll* knew that the suspect was unarmed and nonviolent when the officer first tased the man. *Id.* at 174 (evaluating the use of a taser on a "seated and unarmed" suspect). After the man failed to comply with the officer's repeated commands to get on the ground, the officer tased the man five times in a short time period.  *Id.* at 163-65.  Under these circumstances, the Fifth Circuit granted the officer qualified immunity, finding that, as of 2006, the law "was not clearly established that using a [t]aser to gain compliance of a[n] unarmed, seated suspect for resisting arrest and failing to follow verbal commands was clearly excessive and objectively unreasonable."  *Id.* at 175-76.

Likewise, in *Samples v. Vadzemnieks*, 900 F.3d 655 (5th Cir. 2018), the Fifth Circuit held that it was not clearly established in 2014 that an officer violated the Fourth Amendment by deploying a taser against a mentally unstable individual who failed to cooperate with police orders.  *Id.* at 660, 662-63.  There, two deputies responding to a report that a man was in need of help encountered the plaintiff who was walking in the road, nearly naked

and appearing intoxicated. *Id.* at 660. After one deputy tried to restrain the plaintiff, he "growled" and adopted a "fighting stance." *Id.* at 658. The other deputy tased the plaintiff. *Id.* The Fifth Circuit found that the officer's actions did not violate clearly established law, particularly given the lack of precedent establishing a Fourth Amendment violation when faced with a person displaying "erratic, unpredictable behavior" that "could lead officers to fear sudden or particularly severe violent outbursts, which could in turn give them license to resort to force more readily" than in cases where there is no resistance. *Id.* at 662-63 (contrasting the facts of the case to *Newman* and *Martinez*, and drawing similarities to those of *Carroll*).

Finally, in *Ramirez v. Escajeda*, 44 F.4th 287 (5th Cir. 2022), the court granted an officer qualified immunity when he responded to a 9-1-1 call regarding a suicidal suspect, found the suspect in the process of hanging himself, the suspect refused the officer's commands to show his hands, the officer tased him in response, and the suspect died soon after. *Id.* at 289. In determining whether the officer's conduct was reasonable, the Fifth Circuit emphasized that the suspect was out of custody, creating a tense and uncertain situation for the officer, and the officer feared the suspect had a weapon, increasing the threat of harm. *Id.* at 293-94. The *Ramirez* court further held that as of 2015, the law was not clearly established that an officer

could not use taser force against a person who had not been subdued, and "who may be hanging himself, who may or may not have a weapon, who does not respond to the officer's commands—all when the officer approaches him rapidly, alone, and in the dark." *Id.* at 294.

This case is factually akin to the foregoing precedent where the officers were met with a noncompliant, unsubdued, and mentally incapacitated subject, in which the Fifth Circuit found no Fourth Amendment violations. And plaintiff has failed to identify any intervening case law since *Carroll*, *Escajeda*, or *Samples* that would have reasonably put Deputy Murray on notice that his conduct was clearly prohibited under the particular circumstances of the case.  To the contrary, plaintiff merely cites cases defined by a lack of any substantial threat to safety and a lack of resistance by the suspect at the time the officer resorted to the use of force.  *See, e.g.*, *Darden*, 880 F.3d at 733 (holding that officer's actions "were plainly in conflict with our case law" when he used force against subdued subject who was complaint and not resisting arrest); *Deville*, 567 F.3d at 167-169 (holding that officer was not entitled to qualified immunity for use of force against woman whose "resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child"); *Newman*, 703 F.3d at 760 (holding that it was objectively

unreasonable for the officers to injure a man whose "behavior [did] not rise to the level of active resistance" and who did not fail to comply with their commands); *Martinez*, 716 F.3d at 372 (denying qualified immunity because plaintiff "posed no threat to the officers and yet was tased twice, including once after he was handcuffed and subdued while lying face down on the ground, in violation of clearly established law").  In these cases, the plaintiffs were already subdued and under police control (handcuffed or submitting to a frisk), were not actively resisting arrest, or were otherwise complying with police requests.  Conversely, plaintiff in this case presented a real threat not only to the safety of the officers and others, but also to himself.  After plaintiff physically and verbally resisted the efforts of paramedics and other first responders to subdue him and place him on a gurney for transport to the hospital for more than ten minutes, plaintiff ran out of the house screaming with a syringe in his hand.  At that point, Deputy Murray followed plaintiff outside and confronted plaintiff, who was unrestrained and moving towards a public street.  After plaintiff refused to submit to repeated commands to get on the ground, Deputy Murray tased plaintiff once, and again three-and-a-half seconds later when plaintiff showed signs of continued physical resistance, potentially putting the safety of the two approaching officers at risk.  Contrary to plaintiff's assertions, Deputy Murray did not have plaintiff

"subdued" and under his control when he used his taser.  Instead, Deputy Murray "faced a 'tense, uncertain, and rapidly evolving' situation . . . wholly unlike those faced by the officers in" the cases cited by plaintiff.  *See Escajeda*, 44 F.4th at 293-94 (citations omitted).

Moreover, none of the case law cited by plaintiff presents a factually analogous situation "in which police officers had to decide whether to deploy a taser on an uncooperative subject who [was] . . . unstable." *Samples*, 900 F.3d at 663 (first citing *Ramirez*, 716 F.3d at 372; and then citing *Newman*, 703 F.3d at 762-63).  Nor do they address situations in which the officer attempted to use verbal negotiations before resorting to the use of his taser. *Compare Newman*, 703 F.3d at 760 (denying qualified immunity when "the officers immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands"), *with Pratt*, 822 F.3d at 182 (granting qualified immunity when plaintiff "continuously failed to comply," other "efforts to subdue [him] were ineffective," and he had "continued to resist handcuffing" and "kicked an officer after being taken to the ground"), *and Carroll*, 800 F.3d at 175-76 (granting qualified immunity when officer used force only after plaintiff repeatedly failed to comply with verbal commands to get on the ground).

Plaintiff has therefore failed to identify a case that places "beyond debate" whether Deputy Murray's use of the taser violated the Fourth Amendment. *al-Kidd*, 563 U.S. at 741. Accordingly, the Court finds that the law was not clearly established at the time of the incident that twice using a taser to gain compliance of an unsubdued, uncooperative, and disoriented person was an excessive use of force in violation of the Fourth Amendment.

Deputy Murray is therefore entitled to qualified immunity.


## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment. Plaintiff's § 1983 claim against Deputy Don Murray is DISMISSED WITH PREJUDICE.


New Orleans, Louisiana, this ___16th___ day of May, 2024.


_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE